**McKENNA LONG & ALDRIDGE LLP**

230 Park Avenue
New York, NY 10169
Telephone: (212) 905-8300
Facsimile: (212) 922-1819
Christopher F. Graham

**McKENNA LONG & ALDRIDGE LLP**

303 Peachtree Street, Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Facsimile: (404) 527-4198
J. Michael Levengood (*pro hac vice* admission pending)
Alison M. Elko (*pro hac vice* admission pending)

*Counsel for Debtor Suffolk Regional*
*Off-Track Betting Corporation*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 9 |
| SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, | Case No. 11-42250-CEC |
| Debtor.[1] | |

**DECLARATION OF JEFFREY A. CASALE IN SUPPORT OF THE**
**CHAPTER 9 PETITION AND THE STATEMENT OF QUALIFICATIONS**

      I, Jeffrey A. Casale, declare as follows:

**Background**

      1.    I am the President of Suffolk Regional Off-Track Betting Corporation

("Suffolk OTB"). I make this declaration in support of Suffolk OTB's voluntary petition under

chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") commencing this chapter

---

[1] Suffolk Regional Off-Track Betting Corporation's address is 5 Davids Drive, Hauppauge, New York 11788 and its tax-payer identification number is 11-2336937.

9 case (the "Chapter 9 Case") and the Statement of Qualifications Under Section 109(c) of the

Bankruptcy Code (the "Statement of Qualifications") [Docket No. 12].  Except to those matters

set forth on information and belief, I have personal knowledge of the facts set forth herein and if

called as a witness herein I could testify competently to such facts.

2.      I was appointed President and Chief Executive Officer of Suffolk OTB in

January 2006, after having served as Vice President since March of 2003.  Prior to joining

Suffolk OTB, I served as Executive Director and CEO of the Town of Babylon Industrial

Development Agency from January 2000 to March 2003.  From May 1976 through December

1999, I served as corporate officer and manager of Individual Policyowner Services and Payment

Processing for TIAA-CREF based in NYC.

3.      I am familiar with the historical situation that Suffolk OTB has faced, and

I have personal knowledge of Suffolk OTB's operations and Suffolk OTB's negotiations with

creditors.

### The History and Structure of Suffolk OTB

4.      Suffolk OTB was created by and operates under Article V of the New

York Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law").  It is governed by a

Board of Directors (the "Board") consisting of members appointed by the County Legislature.

5.      Suffolk OTB is one of five separately-governed off-track betting

corporations ("OTBs") in the State of New York ("New York" or the "State").  Headquartered

in Hauppauge, Suffolk OTB has 10 branches throughout the County of Suffolk ("Suffolk" or

the "County").  Suffolk OTB opened its first branch in April 1975, five years after the New York

Legislature authorized the creation of the first OTB in New York City.  In addition to its

branches, Suffolk OTB has 18 Qwik Bet (machine betting) locations, a tele-theater and a telephone account wagering operation.

6.    Suffolk OTB is a public benefit corporation, which offers off-track pari-mutuel wagering on thoroughbred and harness horse races held at race tracks located in the State and certain race tracks located outside of the State.  The objectives of this off-track pari-mutuel betting system are to promote the horse racing industry, generate revenues for the local governments, the County and the State, and diminish the role of illegal bookmakers.

7.    As of March 28, 2011, Suffolk OTB employed in the aggregate approximately 243 employees, of whom approximately 186 are members of two unions.  Of the union members, approximately 163 branch cashiers and attendant custodians are represented by Local 237 of the International Brotherhood of Teamsters ("Teamsters Local 237") and approximately 26 branch managers are represented by Local 517S of the United Food and Commercial Workers Union.  Before the date hereof, Suffolk OTB had entered into labor-related collective bargaining agreements (collectively, the "CBAs") with respect to its union represented employees.  As of the date hereof, the CBAs continue in full force and effect.

## Suffolk OTB's Operations

8.    Pari-mutuel wagering is a system in which all wagers of a particular type on a particular race are placed together into a pool, a certain percentage (the "Wagering Commission") is deducted and retained by the track or OTB at which the wager was placed (the "house"), and the payoff is calculated by allocating the remaining pool among all winning wagers.  Differing from fixed-odd wagering where the payout is agreed upon at the time the wager is placed, the final payout in pari-mutuel wagering is not determined until the pool is closed.  Thus, in the pari-mutuel system, wagering customers determine the payoff odds, and the

bettors are not wagering against the house.  While the Wagering Commission Rate varies for different tracks and different types of wagers, the winning bettors receive on average approximately 80% of the total amounts wagered on each race before deducting breakage (rounding differences due to the fact that payoff amounts are rounded down to the nearest 10 cents) and if applicable, a statutorily imposed surcharge on the winnings for certain wagers.

9.    Suffolk OTB's gross revenue from pari-mutuel wagering consists of the Wagering Commission, the breakage, and the surcharge.  While Suffolk OTB collects significant amounts of money each year, due to statutory and contractual obligations, it must distribute these funds to various designated sources.  Suffolk OTB may not retain any net revenue to help subsidize future operations except for contributions to a capital acquisition fund (the "Capital Acquisition Fund").  In addition, Suffolk OTB must distribute certain percentages of the handle, the breakage, and/or the surcharge to local governments, the County of Suffolk ("Suffolk County" or the "County"), the State of New York ("New York" or the "State"), and the State's horse racing industry, composed of various horse race tracks and horse breeding funds.  These payments, often referred to as "statutory distributions," are based on complex formulas contained in the State's Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law").

10.    The Racing Law mandates that Suffolk OTB pay certain fees, referred to as "Host Track Commissions", to State tracks based on the total Handle that Suffolk OTB receives for races held at those tracks.  Suffolk OTB also simulcasts and accepts wagers on races from tracks outside of New York, as well as on races from tracks inside of New York but outside of Suffolk OTB's region.  The Racing Law requires Suffolk OTB to make payments from the Handle received on these races to certain tracks within the State.  These sums, known as

"Indirect Commissions", differ for harness race tracks and thoroughbred race tracks.  In addition

to the statutory Host Track Commissions and Indirect Commissions, Suffolk OTB makes

contractual payments to both in-state and out-of-state tracks pursuant to negotiated simulcast

contracts.

           11.     The Fourth Quarter 2010 Unaudited Report, attached to the Declaration of

Celine M. Gazes in Support of the Chapter 9 Petition and the Statement of Qualifications (the

"Gazes Declaration") as Exhibit "A", sets forth the operating statements, revenue and expense

statements and allocation of net earnings statements for the three months and year to date ending

December 31, 2010.[2]  As detailed therein, Suffolk OTB processed a total Handle of

approximately $139 million in 2010, and earned approximately $33.26 million in Wagering

Commissions, surcharge, and breakage revenue from pari-mutuel wagering as well as

approximately $1.1 million in other income.  Of the $3.95 million total surcharge revenue,

approximately $1.724 million was distributable to Suffolk County, $723,000 to various other

counties and local governments throughout the State, $503,000 to the Capital Acquisition Fund

and approximately $1 million was retained by Suffolk OTB for its operations.  Suffolk OTB also

incurred the following distribution obligations for the fiscal year 2010: approximately $5.9

million in Host Track Commissions; $4.35 million in Indirect Commissions; $625,000 in

contractual fees (simulcast fees and in-home cable fees); $1 million in amounts distributable to

breeders' funds, $1.84 million in taxes and regulatory fees to New York State.  The remaining

$17.7 million was insufficient to fund operating expenses in excess of $22 million (excluding

certain non-cash expenses).  Consequently, Suffolk OTB incurred an operating deficit of $4.4

million for the 2010 fiscal year.

---

[2]  The Fourth Quarter 2010 Unaudited Report was prepared and submitted to the New York State Racing and
Wagering Board pursuant to section 524 of the Racing Law.

## The Necessity of Chapter 9 Relief

12.     After years of mandatory distributions based on percentages of the Handle instead of percentages of the Wagering Commission revenue it actually receives or of monies remaining after allowance for Suffolk OTB's costs and expenses, Suffolk OTB has been unable to reinvest in its own business and has debts substantially greater than its current ability to repay. Suffolk OTB is currently not paying its debts as they come due.

13.     Suffolk OTB is specifically authorized by name to be a chapter 9 debtor through Resolution No. 38-2011 (the "Suffolk County Resolution") issued by the County Legislature on March 16, 2011.  A true and correct copy of the Suffolk County Resolution is attached to the Statement of Qualifications as Exhibit "A".  On February 24, 2011, the Board voted to pass a resolution (the "Suffolk OTB Board Resolution") authorizing the officers of Suffolk OTB to seek and obtain whatever legislative authorization may be necessary to properly file and commence the action to secure the jurisdiction of the U.S. Bankruptcy Court in order to re-structure the Suffolk OTB's finances and enact a plan to address Suffolk OTB's fiscal health going forward.  A true and correct copy of the Suffolk OTB Board Resolution is attached to the Statement of Qualifications as Exhibit "B".

14.     Suffolk OTB is in the process of developing a plan of adjustment of debts and created and presented different possible restructuring approaches to industry participants.  In particular, Suffolk OTB has developed a plan that would reduce or eliminate debt over a period of time ranging from 18 to 24 months.

15.     Suffolk OTB has attempted to obtain the agreement of creditors holding at least a majority in the amount of the claims of each class that it intends to impair under the proposed plan of adjustment of debts.  Discussions were conducted with several industry

participants to determine their interest in such an arrangement.  Suffolk OTB held a meeting with the New York Racing Association, Inc. and follow-up discussions are ongoing. Suffolk OTB also presented a proposal to Yonkers Raceway, and it has agreed with the intent of the proposal to eliminate debt over time via a payment schedule.  A similar proposal was made to Finger Lakes Racetrack, and Suffolk OTB is awaiting a response.  Representatives of Suffolk OTB have also engaged in ongoing discussions regarding the plan with various creditors, including, but not limited to, New York Commercial Bank, the New York State and Local Retirement System, Suffolk County, Stewart Avenue Associates LLC, Monticello Raceway, Parx, Teamsters Local 237, Nassua Regional Off-Track Betting Corporation, Churchill Downs, Inc., Roberts Communications and Beulah Park.

16.    Suffolk OTB is pursuing protection under chapter 9 of the Bankruptcy Code only after extensively exploring other alternatives.  First, for years Suffolk OTB has sought amendment of the legislative distribution scheme.  It repeatedly petitioned the Legislature to modify the mandatory distributions to the State, counties, local governments and the racing industry mandated by the Racing Law.  In addition, working with the Capital, Catskill, and Western OTBs, Suffolk OTB drafted proposed legislation to address the dual plagues of dysfunctional distribution formulas and unregulated out-of-state Internet wagering companies.  First, the OTBs sought to amend the current distribution formulas that require OTBs around the state to pay privately owned harness tracks - as well as the Finger Lakes thoroughbred track - millions of dollars in commissions and other fees.[3]  Second, the OTBs sought to address the exemption of out-of-state internet wagering companies from pari-mutuel taxes and the statutory

---

[3]  The payments came about because private track operators feared that 2003 legislation that allowed OTBs to carry out-of-state nighttime thoroughbred racing would cause devastating losses to their nighttime harness racing.  This never occurred, yet the State still requires OTBs to make the payments.  The fees are over and above the wagers placed on races run at the host tracks.

and regulatory fees required of the State's OTBs.[4]  Further, for the past four years, Suffolk OTB - with input from the Capital, Catskill, Western, and Nassau OTBs - has promoted a joint venture business model centering on two complementary goals: recognizing the important local nature of off-track wagering and committing to the aggressive pursuit of shared services.  A joint venture cooperative addresses shared services where they make the most economic sense, as well as where they would most enhance customers' experiences.[5]

17.    In my view and in the view of the Board, the further development and implementation of a new business plan for Suffolk OTB is critical to Suffolk OTB's ability to adjust its debts under chapter 9 and to any broader plan to save the New York horse racing industry and help maintain its long-term health.  The development and implementation of a new strategy in conjunction with the implementation of such a business plan are essential to salvage Suffolk OTB.  Moreover, this chapter 9 case represents a unique opportunity for an environment where Suffolk OTB can implement the changes necessary to transform Suffolk OTB into a successful, cost-effective business operation and position it as a catalyst for revitalization of the entire New York horse racing industry.

**The Chapter 9 Plan**

18.    Suffolk OTB is in the process of developing a plan of debt readjustment.  For several years, Suffolk OTB has strongly advocated for shared services and joint ventures with other regional OTBs in New York as a means of reducing expenses and creating greater efficiencies of operations.  In fact, Suffolk and Nassau OTBs are the only two regions in the

---

[4]  As a result, out-of-state internet wagering companies can offer more to customers in rewards and rebates and are taking the State's OTB customers.  But while out-of-state tracks benefit, the State lose millions in annual revenues because those tracks fail to pay pari-mutuel taxes and statutory and  regulatory fees to the State.

[5]  Examples of cost-efficient shared services include a common electronic system for placing wagers, a statewide Internet wagering portal and a statewide marketing and branding campaign.

State that have long term joint ventures in place. Suffolk OTB's telephone account wagering operation handles all telephone account wagering for Nassau OTB. Suffolk OTB has an in-house printing operation that provides printing services for Nassau OTB. Suffolk and Nassau OTB management has met on several occasions to explore expansion of joint ventures and shared services, including internet wagering platforms, purchasing, and legal services. While no agreements have been reached between the regions, discussions are continuing. In addition, Suffolk is exploring the potential for other joint venture opportunities with other regional OTBs and one other industry participant in the State.

19.    Discussions are ongoing with two banks in an effort to secure partial funding for Suffolk OTB's plans (based on equity in Suffolk OTB's real estate holdings).

20.    Suffolk OTB has also been regularly reducing operating expenses over the past five years as set forth in the Gazes Declaration. Since 2006, cuts in operating expenses totaling over $6 million were implemented by Suffolk OTB. These cuts were partially off-set by increases in certain expenses such as pension contributions and health insurance premiums, among others. Also, in just the past two years, approximately $4 million in expenses were cut from the operating budget. Suffolk OTB has reduced its staffing level by 110 positions since 2006. In addition, Suffolk OTB has gone from 14 "bricks and mortar" branches to 11, with plans in place to close two more branches within the next two months. In 2010, Suffolk OTB and Teamsters Local 237 negotiated several changes to the existing CBA, which include a pay scale freeze for members of that union.

21.    While Suffolk OTB has long advocated for changes to the statutory payment structure governing all OTB's revenue distributions, it is not anticipating any immediate changes being enacted by the State Legislature. However, there has been some

movement with regard to the restriction placed on "capital acquisition funds" in that there have been recent negotiations to remove those restrictions for Suffolk OTB as was done for NYC OTB.  Suffolk OTB would welcome such action.

22.    Though a number of other aspects of Suffolk OTB's plan are still under consideration, it expects that the plan, when finalized, will (i) reduce costs and provide for improved operational efficiencies, (ii) lay out a compelling strategy to expand the business by attracting new consumers, improving the Suffolk OTB experience for existing customers, and accessing other new sources of revenue, and (iii) contemplate the receipt of new debt financing to pay its existing obligations and to fund current operations and the plans for growth.  Suffolk OTB believes that there is a real opportunity to return its business to overall profitability and growth.

Executed this 29th day of March 2011, at Hauppauge, New York.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

s/ Jeffrey A. Casale
Jeffrey A. Casale