**McKENNA LONG & ALDRIDGE LLP**
230 Park Avenue
New York, New York 10169
Telephone: (212) 905-8300
Facsimile: (212) 922-1819
Christopher F. Graham

**McKENNA LONG & ALDRIDGE LLP**
303 Peachtree Street, Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Facsimile: (404) 527-4198
J. Michael Levengood (*pro hac vice* admission pending)
Alison M. Elko (*pro hac vice* admission pending)

*Counsel for Debtor Suffolk Regional*
*Off-Track Betting Corporation*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,<br><br>Debtor.[1] | Chapter 9<br><br>Case No. 11-42250-CEC |

**DECLARATION OF CELINE M. GAZES IN SUPPORT OF THE**
**CHAPTER 9 PETITION AND THE STATEMENT OF QUALIFICATIONS**

I, Celine M. Gazes, declare as follows:

**Background**

1. I am the Comptroller and the Director of Finance for Suffolk Regional

Off-Track Betting Corporation ("Suffolk OTB"). I make this declaration in support of Suffolk

OTB's voluntary petition under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101

---

[1] Suffolk Regional Off-Track Betting Corporation's address is 5 Davids Drive, Hauppauge, New York 11788 and its tax-payer identification number is 11-2336937.

*et seq*. (the "Bankruptcy Code") commencing this chapter 9 case (the "Chapter 9 Case") and the Statement of Qualifications Under Section 109(c) of the Bankruptcy Code filed on March 25, 2011 [Docket No. 12] ("Statement of Qualifications").  Except for those matters set forth on information and belief, I have personal knowledge of the facts set forth herein and, if called as a witness herein, I could testify competently to such facts.

   2. I received a Bachelor's degree in Accounting from the State University of New York at Old Westbury in 1988.  I worked for 13 years in public accounting at the firm of Albrecht, Viggiano, Zureck & Co. P.C., starting as a staff accountant and ending as an audit manager specializing in municipal audit clients including Towns, Villages and Special Districts.  For several years prior to working at Suffolk OTB, I served as the audit manager on the audit of Suffolk OTB.  I am a licensed CPA in the State of New York, and I have worked as the Comptroller and the Director of Finance of Suffolk OTB since May of 2004.

   3. I have personal knowledge of Suffolk OTB's operating history, the facts and circumstances leading to the filing of this Chapter 9 Case, and Suffolk OTB's current and projected future financial situation.

## Exhibits Attached to this Declaration

   4. Attached to this declaration are the following documents: **Exhibit "A"** - Unaudited Uniform Quarterly Report of Suffolk OTB for the Fourth Quarter of 2010 (the "Fourth Quarter 2010 Unaudited Report"); **Exhibit "B"** - State of New York Office of Comptroller Audit Regarding Financial Condition of New York State Regional Off-Track Betting Corporations (2009-MS-10) (the "Regional OTBs Audit"); **Exhibit "C"** - State of New York Office of Comptroller Audit of Suffolk OTB (S9-9-84) (the "Suffolk OTB Audit"); and **Exhibit "D"** - Suffolk OTB Cost Savings (FY 2006-2011) (the "Suffolk OTB Costs Savings

Summary"). Each exhibit attached hereto is a true and correct copy of the document described herein.

### Suffolk OTB's Accounting and Finances

5.      Suffolk OTB maintains its records, prepares its budget, and issues its audited financial statements in accordance with generally accepted accounting principles ("GAAP") for state and local governments established by the Governmental Accounting Standards Board ("GASB").

### Suffolk OTB's Operations

6.      Pari-mutuel wagering is a system in which all wagers of a particular type on a particular race are placed together into a pool, a certain percentage (the "Wagering Commission") is deducted and retained by the track or OTB at which the wager was placed (the "house"), and the payoff is calculated by allocating the remaining pool among all winning wagers. Differing from fixed-odd wagering where the payout is agreed upon at the time the wager is placed, the final payout in pari-mutuel wagering is not determined until the pool is closed. Thus, in the pari-mutuel system, wagering customers determine the payoff odds, and the bettors are not wagering against the house. While the Wagering Commission Rate varies for different tracks and different types of wagers, the winning bettors receive on average approximately 80% of the total amounts wagered on each race before deducting breakage (rounding differences due to the fact that payoff amounts are rounded down to the nearest 10 cents) and if applicable, a statutorily imposed surcharge on the winnings for certain wagers.

7.      Suffolk OTB's gross revenue from pari-mutuel wagering consists of the Wagering Commission, the breakage, and the surcharge. While Suffolk OTB collects significant amounts of money each year, due to statutory and contractual obligations, it must

distribute these funds to various designated sources. Suffolk OTB may not retain any net revenue to help subsidize future operations except for contributions to a capital acquisition fund (the "Capital Acquisition Fund"). In addition, Suffolk OTB must distribute certain percentages of the handle, the breakage, and/or the surcharge to local governments, the County of Suffolk ("Suffolk County" or the "County"), the State of New York ("New York" or the "State"), and the State's horse racing industry, composed of various horse race tracks and horse breeding funds. These payments, often referred to as "statutory distributions," are based on complex formulas contained in the State's Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law").

8. The Racing Law mandates that Suffolk OTB pay certain fees, referred to as "Host Track Commissions", to State tracks based on the total Handle that Suffolk OTB receives for races held at those tracks. Suffolk OTB also simulcasts and accepts wagers on races from tracks outside of New York, as well as on races from tracks inside of New York but outside of Suffolk OTB's region. The Racing Law requires Suffolk OTB to make payments from the Handle received on these races to certain tracks within the State. These sums, known as "Indirect Commissions", differ for harness race tracks and thoroughbred race tracks. In addition to the statutory Host Track Commissions and Indirect Commissions, Suffolk OTB makes contractual payments to both in-state and out-of-state tracks pursuant to negotiated simulcast contracts.

9. The Fourth Quarter 2010 Unaudited Report, attached hereto as Exhibit "A", sets forth the operating statements, revenue and expense statements and allocation of net earnings statements for the three months and year to date ending December 31, 2010.[2] As

---

[2] The Fourth Quarter 2010 Unaudited Report was prepared and submitted to the New York State Racing and Wagering Board pursuant to section 524 of the Racing Law.

detailed therein, Suffolk OTB processed a total Handle of approximately $139 million in 2010, and earned approximately $33.26 million in Wagering Commissions, surcharge, and breakage revenue from pari-mutuel wagering as well as approximately $1.1 million in other income. Of the $3.95 million total surcharge revenue, approximately $1.724 million was distributable to Suffolk County, $723,000 to various other counties and local governments throughout the State, $503,000 to the Capital Acquisition Fund and approximately $1 million was retained by Suffolk OTB for its operations. Suffolk OTB also incurred the following distribution obligations for the fiscal year 2010: approximately $5.9 million in Host Track Commissions; $4.35 million in Indirect Commissions; $625,000 in contractual fees (simulcast fees and in-home cable fees); $1 million in amounts distributable to breeders' funds, $1.84 million in taxes and regulatory fees to New York State. The remaining $17.7 million was insufficient to fund operating expenses in excess of $22 million (excluding certain non-cash expenses). Consequently, Suffolk OTB incurred an operating deficit of $4.4 million for the 2010 fiscal year.

## Deterioration of Suffolk OTB's Finances Over the Past Few Years

**A.    DiNapoli Audits and Suffolk OTB's Financial Difficulties**

10.    In May of 2010, the Comptroller for the State of New York, Thomas DiNapoli, released the Regional OTBs Audit, attached hereto as Exhibit "B". The Regional OTBs Audit found that within the five years prior to the Audit, the financial condition of the OTBs had "substantially deteriorated" as the total Handle received by the OTBs declined by almost $103 million (10 percent). Regional OTBs Audit, p. 4. In fact, in the first five months of 2009, the Handle fell by 10 percent when compared to the same period in 2008. *Id.* The Regional OTBs Audit also observed that, between 2004 and 2008, the OTBs were required to pay 56 percent of their remaining Handle (total Handle after paying bettors) to the State,

counties, local governments and the racing industry before paying operating expenses. *Id*. In addition, despite a reduction in operating expenses, the Regional OTBs Audit determined that the OTBs net operating revenues declined by 67 percent due to the combination of the declining Handle and "up front" payments made to the State, counties, local governments and the racing industry. *Id*.

11.     The Regional OTBs Audit surmised that the OTBs' deteriorating financial condition resulted from external factors including, but not limited to, an estimated 10 percent nationwide decline in the amount of betting on horse racing; competition with other gaming entities, such as casinos and out-of-state advance deposit wagering companies that are not regulated by, nor pay any distributions to, the State; a 2003 law that mandates that OTBs pay harness tracks compensation at "rates that are outdated and too high" if the OTBs take wagers on nighttime thoroughbred races; and the harness tracks' restrictions on OTBs' ability to adjust operations. *Id*.

12.     In connection with the Regional OTBs Audit, Mr. DiNapoli also separately audited each OTB and reported his findings with respect to Suffolk OTB in May of 2010 in the Suffolk OTB Audit, attached hereto as Exhibit "C". The Suffolk OTB Audit concluded that, during the five years prior to the Audit, Suffolk OTB's financial condition deteriorated due to the economic downturn, continual decreases in wagering, waning interest in horse racing and increased competition from other entities in the gaming industry. Suffolk OTB Audit, p. 4. During this time, Suffolk OTB experienced a 13 percent ($26.7 million) decline in the Handle. *Id*. This decrease in the Handle and a drop in net operating revenues resulted in three consecutive years of deficits in net revenue from operations. *Id*. According to the Suffolk OTB Audit, these declines significantly affected the revenue distributions to local

governments, which decreased 16 percent the five year period prior to the Audit. *Id*. The Suffolk OTB Audit also recognized that, despite the efforts taken by Suffolk OTB officials to decrease operating expenditures and increase Handle and revenues, net operating losses grew for the three years prior to the Audit. *Id*. Further, Suffolk OTB experienced cash flow problems resulting in operating expenditures not being paid in a timely manner.[3] *Id*.

**B.      Suffolk OTB's inability to pay debts as they came due**

13.     Suffolk OTB has operated at a deficit for the last four years. For the fiscal years ending December 31, 2007, 2008, 2009 and 2010, Suffolk OTB had approximate operating deficits of $3.530 million, $4.857 million, $4.869 million and $4.376 million, respectively.[4] After statutory and contractual distributions, approximate net revenue was $24.798 million in 2008, $21.946 million in 2009 and $19.94 million in 2010. Even though revenue decreased over $2 million from 2009 to 2010 and approximately $4.9 million from 2008 to 2010, Suffolk OTB's loss in 2010 was less than in the two previous years, due largely to efforts by Suffolk OTB to cut costs. These losses resulted in liquidity challenges for Suffolk OTB. Because of these challenges, Suffolk OTB has been unable to pay all of its debts as they come due in the ordinary course of business beginning approximately in the third quarter of 2010.

---

[3] According to the Suffolk OTB Audit, it "became necessary for [Suffolk OTB] to use funds segregated for potential judgments/liabilities to alleviate cash flow problems. As a result, [Suffolk OTB] borrowed $2,000,000 on a line of credit in order to pay the judgments." *Id*.

[4] These amounts do not include the Capital Acquisition Fund.

### Suffolk OTB's Outstanding Debt Obligations

14.  According to the Fourth Quarter 2010 Unaudited Report, as of December 31, 2010, Suffolk OTB had approximately $5.760 million recorded on its books as accounts payable and accrued expenses.[5] During the fiscal year 2010, Suffolk OTB owed approximately $473,400 in governmental statutory claims to the State, County and other local governments and approximately $61,434 to various racing industry claimants.[6] As of December 31, 2010, Suffolk OTB held approximately $918,665 in uncashed winning tickets, uncashed vouchers wagers and deposits for wagering for customers. During 2010, Suffolk OTB accrued approximately $1.046 million for employees' accrued payroll, benefits and payroll taxes in addition to $10.350 million in estimated postemployment benefit liabilities as per GASB Statement 45. New York Commercial Bank holds a secured claim for the approximate amount of $5,378,223, the collateral for which is certain real property, and fixtures of Suffolk OTB.[7]

### Fiscal Year 2010 Revenues

15.  The Fourth Quarter 2010 Unaudited Report details Suffolk OTB's fiscal year 2010 revenues, which are driven by the amount of wagers taken during the year (or the "Handle"). The total amount of the Handle for fiscal year 2010 was approximately $139 million. After paying winning wagers, Suffolk OTB's gross revenue was approximately $34.806 million comprised of: gross Wagering Commissions and breakage of $29.313 million; unclaimed tickets of $440,000; distributable surcharge and surcharge breakage of $2.447 million; retained

---

[5] This amount includes various amounts owed to the race tracks.

[6] This amount does not include approximately $506,888 in uncashed winning tickets, of which any portion remaining uncashed as of March 31, 2011 will be remitted to the State.

[7] Upon information and belief, Stewart Avenue Associates LLC holds an unsecured promissory note in the amount of $362,161 as of December 31, 2010 relating to tenant improvements.

surcharge for operations of $1,001 million; Capital Acquisition Fund revenues of $503,000; and interest income and other revenues of $1.102 million.

## Fiscal Year 2010 Expenditures

16. Suffolk OTB is comprised of 10 branches, 18 Qwik Bet (machine wagering) locations, a tele-theater and a headquarters/warehouse operation. According to the Fourth Quarter 2010 Unaudited Report, Suffolk OTB's largest operating expense, after personnel related expenses, was approximately $2.194 million for occupancy expenses, including rent and utilities.

17. The Fourth Quarter 2010 Unaudited Report sets forth Suffolk OTB's fiscal year 2010 expenditures. Expenditures are comprised of two major categories: (i) statutory expenses, which consist of mandatory distributions to the State, County and other local governments and to the racing industry; and (ii) operating expenses, which are the expenses incurred in running the day to day operations of Suffolk OTB. For the 2010 fiscal year, Suffolk OTB incurred statutory and contractual revenue distributions in the approximate amount of $16.591 million and total operating and administrative expenses in the approximate amount of $22.089 million.

18. During 2010, Suffolk OTB employed 267 full and part time employees with an annual payroll, including salaries, wages and overtime, of approximately $10.874 million, as itemized in the Fourth Quarter 2010 Unaudited Report. In addition, Suffolk OTB provided benefits, including health and medical coverage, welfare funds, vacation and sick leave, at an approximate cost of $4.168 million, as well as employee pension plan contributions of approximately $929,000 to the New York State and Local Retirement System (NYSERS). Suffolk OTB also provided medical and other postemployment benefits to its retirees and their

spouses at an approximate cost of $1.208 million. As required by GASB Statement 45, Suffolk OTB recorded an expense in the amount of $2.080 million for estimated future retiree benefits.

19. During the fiscal year 2010, Suffolk OTB also paid approximately $150,000 in simulcast costs to show the races in its branches, teletheater and restaurant facility, and $1.1 million in totalisator services to process the customers' betting activities fees. The use of telephones and data lines cost an additional $82,160, while equipment rental, and maintenance and repairs cost $632,506. Insurance protection for the overall operations costs approximately $191,904. Suffolk OTB paid approximately $235,975 for legal and other professional fees.

20. During the past few years, Suffolk OTB's management has taken numerous steps to reduce operating costs. After a thorough review of branch operations to determine if unprofitable branches should be closed or if operational adjustments could be made in order to turn the branches into profitable sites, Suffolk OTB closed two branches, one in September 2009 and one in March 2010. Reductions in personnel-related costs have been achieved by imposing a hiring freeze, carefully managing schedules to reduce hours in branches, and reducing administrative staffing levels through attrition. Suffolk OTB required employees to begin contributing 15% towards the cost of their health insurance effective June 2009. Additional actions taken include significant reductions in Suffolk OTB's vehicle fleet, and the implementation of a cash rewards program in lieu of promotional food, beverage, and publication expenses. Suffolk OTB has also realized additional cost savings by changing vendors for racing communication signals and offering internet wagering beginning in April 2010. These and various other cost-cutting initiatives are listed in the Suffolk OTB Cost Savings Summary, attached hereto as Exhibit "D".

21. As a result of the above mentioned actions, operating and administrative expenses decreased from approximately $26.750 million in 2008 to approximately $24.250 million in 2009, a $2.1 million reduction, and then to approximately $22.120 million in 2010, an additional $2.5 million reduction. Thus, over a two-year period, Suffolk OTB's operating expenses were reduced by $4.6 million.

## The Necessity of Chapter 9 Relief

22. Suffolk OTB has determined that filing its chapter 9 petition is the only practicable way to obtain the time and protection it needs to carry out the vital operational changes required to access capital and to return to profitability and thereby fulfill its statutory mission to provide reasonable revenue for the support of the State, the County, and the horse racing industry.

Executed this 29th day of March 2011, at Hauppauge, New York.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

s/Celine M. Gazes
Celine M. Gazes