UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In Re

                                    Chapter 9

Suffolk Regional Off-Track Betting Corp.
d/b/a Suffolk OTB,

                                    Case No. 11-42250-CEC

                Debtor.
--------------------------------------------------------X

## <u>DECISION</u>

APPEARANCES:

| | |
|---|---|
| Christopher F. Graham, Esq. | Robert J. Brown, Esq. |
| Charles E. Dorkey III, Esq. | Daniel I. Waxman, Esq. |
| Rebecca Tingey, Esq. | Wyatt, Tarrant & Combs, LLP |
| McKenna Long & Aldridge LLP | 250 West Main Street, Suite 1600 |
| 230 Park Avenue | Lexington, KY 40507 |
| New York, NY 10169 | Attorneys for Churchill Downs Inc. |
| Attorneys for Debtor | |

Frank F. Chuppe, Esq.

Kelly M. Lamendola, Esq.                                       Wyatt, Tarrant & Combs, LLP
McKenna Long & Aldridge LLP                            500 West Jefferson Street, Suite 2800
111 Washington Avenue, 7th Fl.                        Louisville, KY 40202
Albany, NY 12210                                              Attorneys for Churchill Downs Inc.
Attorneys for Debtor

J. Michael Levengood, Esq.
Alison Elko Franklin, Esq.
David E. Gordon, Esq.
McKenna Long & Aldridge LLP
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308
Attorneys for Debtor

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the objection of Churchill Downs Incorporated ("Churchill Downs") to the entry of an order for relief in this case, which was filed by Suffolk Regional Off-Track Betting Corporation ("Suffolk OTB" or the "Debtor").  Churchill Downs maintains that Suffolk OTB did not obtain the requisite authorization to commence this chapter 9 bankruptcy case under § 109(c)(2).  Suffolk OTB challenges Churchill Downs's standing to object to entry of an order for relief, and argues that, in any event, the requirements of § 109 were satisfied.  Suffolk OTB's petition is dismissed pursuant to § 921(c) because the bankruptcy filing was not authorized as required by § 109(c)(2), and therefore, Suffolk OTB is ineligible to be a debtor under chapter 9 of title 11, U.S.C.[1]

## Jurisdiction

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the Eastern District of New York standing order of reference dated August 28, 1986. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## Background

The following facts are undisputed.

Suffolk OTB, a public benefit corporation created by Article V of the New York State Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing and Wagering Law"), is one of five separately governed regional off-track betting corporations in the State of New York. Suffolk OTB offers pari-mutuel wagering on thoroughbred and harness horse races held at racetracks located within and without the State of New York.  Casale Decl. ¶¶ 4, 5, 6, Mar. 29, 2011, ECF No. 19.

---

[1] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11, U.S.C.

On March 16, 2011, the Suffolk County Legislature issued, and the County Executive approved, Resolution No. 38-2011, authorizing Suffolk OTB to file a petition under chapter 9 of the Bankruptcy Code (the "County Resolution"), and on March 18, 2011, Suffolk OTB filed a petition under chapter 9 of the Bankruptcy Code.  Suffolk OTB has cited a number of factors as contributing to the financial difficulties that led to its bankruptcy filing, including the legislative scheme under which it operates.  Casale Decl. ¶¶ 9-10, ECF No. 19.  Under the Racing and Wagering Law, Suffolk OTB is required to distribute certain percentages of its revenue to state and local governments, and to New York's horse racing industry.  The revenue remaining after payment of mandatory distributions was insufficient to fund Suffolk OTB's operating expenses for its 2010 fiscal year, and years of making these required payments has left Suffolk OTB unable to reinvest in its business and with debts greater than its ability to pay.  Casale Decl. ¶¶ 11-12, ECF No. 19.  Suffolk OTB hopes to develop a plan that would enable it to emerge from chapter 9 by reducing costs, improving operational efficiencies, expanding its business, and obtaining new debt financing to pay its existing creditors and to fund its operations and plans for growth.  Casale Decl. ¶ 22, ECF No. 19.

Churchill Downs, a Kentucky corporation, owns various racetracks, including Churchill Downs Racetrack, Calder Race Course, Fair Grounds Race Course, and Arlington Park (the "Churchill Tracks"), directly or through wholly-owned subsidiaries.  Joint Stipulation of Facts ¶ 6, ECF No. 137.  Suffolk OTB accepts wagers on races held at the Churchill Tracks and displays simulcast broadcasts of these races at various of its locations.  Joint Stipulation of Facts ¶ 4, ECF No. 137.

Suffolk OTB listed "Churchill Downs Inc./Churchill Downs Simulcast Network" in its List of Creditors Holding 30 Largest Unsecured Claims (the "Creditor List") on account of a

$36,440.18 pre-petition claim arising from "[h]ost track settlements, including commissions payable on racing wagers."[2]  Joint Stipulation of Facts ¶ 16, ECF No. 137; Creditor List, ECF No. 3.  Churchill Downs and TrackNet Media Group, LLC ("TrackNet"), an affiliate of Churchill Downs, were separately listed on Schedule G as parties to executory contracts with Suffolk OTB.  Schedule G, ECF Nos. 74, 74-5; Joint Stipulation of Facts ¶ 17, ECF No. 137.

During the post-petition period, the Churchill Tracks have continued to provide their simulcast signal and related wagering activity to Suffolk OTB, and Suffolk OTB has continued to pay the Churchill Tracks through the Churchill Downs Simulcast Network, a wholly-owned subsidiary of Churchill Downs, in accordance with the monetary terms of the contract governing these obligations.  Joint Stipulation of Facts ¶ 18, ECF No. 137.

On April 12, 2011, an order was issued scheduling a hearing for May 18, 2011, to consider any objections to the petition, and to consider entry of an order for relief pursuant to § 921.  On May 11, 2011, Churchill Downs filed its objection to the petition, arguing that the Suffolk County Legislature did not have authority to authorize Suffolk OTB's bankruptcy filing.  No other objections were filed.  On June 14, 2011, the day before the adjourned hearing on Suffolk OTB's eligibility to be a chapter 9 debtor, Suffolk OTB satisfied the pre-petition obligation owed to "Churchill Downs/Churchill Downs Simulcast Network."[3]  Joint Stipulation of Facts ¶ 16, ECF No. 137.

In a post hearing brief filed on June 27, 2011, Suffolk OTB challenged Churchill Downs's standing to object to the petition.  Suffolk OTB argues that Churchill Downs lacks standing as a creditor because its pre-petition claim had been paid in full, Suffolk OTB's Post-

---

[2] On May 17, 2011, Suffolk OTB filed an amended Creditor List, listing debts owed to "Churchill Downs Inc./Churchill Downs Simulcast Network" in the amounts of "39,961.20 (Multiple Tracks) $2,129.70 (Hoosier)." Amended Creditor List, ECF No. 76.
[3] Chapter 9 does not prohibit a debtor from paying a pre-petition debt post-petition.  11 U.S.C. §§ 901, 904.

Hearing Brief at ¶ 28, ECF No. 101, and also lacks standing as a party to an executory contract. While acknowledging that it "has stated in the past that it has an executory contract with Churchill Downs," Suffolk OTB asserted that "a further review of Suffolk OTB's records indicates that this is not in fact the case," in that the contract in question is between Suffolk OTB and TrackNet, an affiliate of Churchill Downs.  Suffolk OTB's Post-Hearing Brief at ¶ 29, ECF No. 101.  A hearing was held on July 13, 2011, and an evidentiary hearing was held on October 25, 2011, on this issue.

Discussion

I.    <u>Churchill Downs, as a party to an executory contract with Suffolk OTB, has standing to object to the entry of an order for relief in this case.</u>

A.   <u>The Parties' Contentions</u>

Suffolk OTB contends that Churchill Downs is neither a creditor of the Debtor nor a party to an executory contract with the Debtor, and therefore lacks standing to object to the entry of an order for relief pursuant to § 921.  Churchill Downs contends that it has standing as a party to an executory contract with the Debtor, because, although it is not named a party in the contract in question, TrackNet entered into that contract as its agent.

"Standing is a threshold issue in every federal litigation."  <u>Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)</u>, 417 B.R. 197, 209 (Bankr. S.D.N.Y. 2009), <u>aff'd</u>, No. 09 CIV 09674 (PKC), 2010 WL 2034509 (S.D.N.Y. May 13, 2010), <u>aff'd</u>, 640 F.3d 53 (2d Cir. 2011). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).  "To establish Article III standing, a party must show (1) an injury in fact that is actual or imminent rather than conjectural or hypothetical, (2) the injury is fairly traceable to the

conduct complained of, and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision."  Teligent, 417 B.R. at 210 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "Prudential standing refers to the requirement that even '[w]hen the plaintiff has alleged injury sufficient to meet the case or controversy requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  Id. (quoting Warth, 422 U.S. at 499)).

Additionally, § 1109, made applicable to chapter 9 cases pursuant to § 901, confers standing to "raise and . . . appear and be heard on any issue in a case under [chapter 9]" on a "party in interest."  11 U.S.C. §§ 901, 1109; In re Valley Health Sys., 429 B.R. 692, 710 n.45 (Bankr. C.D. Cal. 2010) ("Section 1109(b) is applicable to chapter 9 cases.").  To qualify as a "party in interest," a party must establish that it has a "direct financial stake in the outcome" of the issue on which it seeks to be heard.  Teligent, 417 B.R. at 210 (quoting Doral Ctr., Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.), 208 B.R. 812, 814 (S.D.N.Y. 1997)).  See also In re Innkeepers USA Trust, 448 B.R. 131, 141 (Bankr. S.D.N.Y. 2011) ("Courts in this District, while generally interpreting section 1109(b) broadly, have limited 'party in interest' standing where a party's interest in the proceeding is not a direct one.").  The Second Circuit has "rejected as incompatible with the purposes of the Code the notion that any particular creditor's interest may be asserted by anyone other than that creditor."  Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.), 505 F.3d 109, 117 (2d. Cir. 2007) (citing Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp), 698 F.2d 571, 573 (2d Cir. 1983)).  The determination whether a party is a "party in interest" is made on a case-by-case basis.  Church Mut. Ins. Co. v. Am. Home Assurance Co. (In re Heating Oil Partners, LP), 422 F. App'x 15, 17 (2d Cir. 2011).

Suffolk OTB argues that Churchill Downs is not a creditor in this case because, on June 14, 2011, Suffolk OTB satisfied the pre-petition debt owed to Churchill Downs on account of "[h]ost track settlements, including commissions payable on racing wagers."  Joint Stipulation of Facts ¶ 16, ECF No. 137.  Suffolk OTB argues that Churchill Downs is not a party to the executory contract under which that debt arose, which was signed by TrackNet, not Churchill Downs, and that any rights Churchill Downs asserts pursuant to that contract are derivative in nature, and therefore insufficient to confer standing.  Alternatively, Suffolk OTB argues that, if Churchill Downs is a party to the contract, Churchill Downs does not have a pecuniary interest in this matter because Suffolk OTB "issued a check in the amount of $100,000 made payable to [counsel for Churchill Downs] as an advance against any amounts that might be payable to Churchill [Downs] for future simulcast content and related wagering activity" through the term of the contract.  Gazes Decl. ¶ 9, Oct. 20, 2011, ECF No. 141.  "This amount is twice the estimated maximum exposure of Suffolk OTB to Churchill based on historical trends."  Id.  For these reasons, Suffolk OTB argues that Churchill Downs lacks standing to object to the entry of an order for relief.

Churchill Downs contends that it is a party to the executory contract between TrackNet and Suffolk OTB because TrackNet entered into the contract as Churchill Downs's agent. Churchill Downs further asserts that the funds advanced by the Debtor might not fully satisfy the Debtor's remaining financial obligations under the contract, and that, in any event, the Debtor has ongoing non-monetary obligations under the contract.  For these reasons, Churchill Downs argues, it has standing to object to entry of the order for relief.

B.  The Relevant Agreements

On March 4, 2007, Churchill Downs, CD Contentco HC, LLC ("CD Contentco"), Magna

Entertainment Corp. ("Magna"), and MEC Content Holdco LLC ("MEC Content Holdco")

entered into the operating agreement of TrackNet (the "Operating Agreement").  Ex. 8; Joint

Stipulation of Facts ¶1, ECF No. 137.  CD Contenco, a wholly owned subsidiary of Churchill

Downs, held 50% of the membership interest in TrackNet, and MEC Content Holdco, a wholly

owned subsidiary of Magna, held the other 50% membership interest; Churchill Downs and

Magna, though parties to the Operating Agreement, were not members of the limited liability

company.  Ex. 8 at 1, ¶ 1.6[a], Schedule A; Joint Stipulation of Facts ¶¶ 1, 3, ECF No. 137.

The Operating Agreement authorized TrackNet "as the sole and exclusive agent for"

Churchill Downs, CD Contentco, Magna, and MEC Content Holdco, and their affiliates, to

engage in certain business activities.  Ex. 8 ¶ 1.3[b].  "TrackNet served as the exclusive agent for

various tracks owned by Churchill [Downs] and Magna in the negotiation and distribution of

their respective simulcast signals to racetracks and off-track betting entities like Suffolk OTB."

Joint Stipulation of Facts ¶ 2, ECF No. 137.

TrackNet and Suffolk OTB, along with five other New York State off-track betting

corporations, entered into a term sheet dated February 16, 2008 (the "Term Sheet"), Ex. 9,

"whereby the [off-track betting corporations, including Suffolk OTB], were granted the right to

accept commingled pari-mutuel wagers on, and display signals of, races conducted at racetracks"

owned by Churchill Downs and Magna, Joint Stipulation of Facts ¶ 4, ECF No. 137.  The Term

Sheet expired on December 31, 2009.  Ex. 9 at 1; Joint Stipulation of Facts ¶ 4, ECF No. 137.

On December 31, 2009, TrackNet and Suffolk OTB, along with the five other off-track

betting corporations that were parties to the Term Sheet, entered into an Amended Term Sheet,

extending the term of the Term Sheet to December 31, 2011 (the "Amended Term Sheet"). Ex. 10; Joint Stipulation of Facts ¶ 5, ECF No. 137. Four of the racetracks subject to the Amended Term Sheet are Churchill Tracks. Joint Stipulation of Facts ¶ 6, ECF No. 137. "Upon receiving simulcast content from, and taking wagers on races taking place at, the Churchill Tracks, pursuant to the Amended Term Sheet," Suffolk OTB remitted payment to Churchill Downs Simulcast Network, "the product content provider for Churchill [Downs]." Joint Stipulation of Fact ¶ 7, ECF No. 137. Thus, although Churchill Downs was not named as a party to the Amended Term Sheet, Suffolk OTB made its contractually required payments to Churchill Downs's designee, not to TrackNet.

On May 14, 2010, Churchill Downs, CD Contentco, MI Developments Investments Inc. (successor to Magna), and MEC Content Holdco entered into a dissolution agreement for TrackNet (the "Dissolution Agreement").[4] Ex. 12; Joint Stipulations of Facts ¶ 8, ECF No. 137. Thereafter, on September 12, 2011, a Certificate of Cancellation of TrackNet was executed and filed with the Delaware Secretary of State pursuant to Delaware state law. Ex. 15; Joint Stipulation of Facts ¶ 8, ECF No. 137.

After the Dissolution Agreement was executed, the parties continued to perform in accordance with the Amended Term Sheet: Suffolk OTB accepted wagers on races taking place at the Churchill Tracks, received the simulcast signals from the Churchill Tracks, and remitted payment to Churchill Downs Simulcast Network, as it had before TrackNet dissolved. Joint Stipulation of Facts ¶¶ 7, 10, ECF No. 137. The Churchill Tracks performed in accordance with the Amended Term Sheet after TrackNet's dissolution by providing their simulcast signals to Suffolk OTB. Joint Stipulation of Facts ¶ 10, ECF No. 137.

---

[4] In connection with Magna's chapter 11 bankruptcy case in Delaware, Magna "transferred its ownership interests in the assets of certain licensed horse racing and pari-mutuel wagering facilities" to MI Developments Investments Inc. Ex. 12 at 1. See also Joint Stipulation of Facts ¶ 8, ECF No. 137.

Suffolk OTB argues that the simulcast signals transmitted pursuant to the Amended Term Sheet for the Churchill Tracks were licensed from Churchill Downs to TrackNet pursuant to the Operating Agreement, and therefore, TrackNet was not acting as Churchill Downs's agent, but rather as a licensee and sublicensor. This characterization ignores crucial provisions of the Operating Agreement, which both authorized TrackNet to act as its agent, and at the same time, granted TrackNet licenses with respect to certain rights and authorized TrackNet to sublicense those rights.

For example, section 1.3 of the Operating Agreement, entitled "Purpose and Scope," TrackNet is authorized, "as the sole and exclusive <u>agent</u>" for Churchill Downs and Magna, to "<u>sublicense</u>" Churchill Downs and Magna's ADW Content Rights, Point to Point Content Rights, and Rebate Content Rights to third parties. [5] Ex. 8 ¶ 1.3[b][i]4-6 (emphasis added). At the same time, Schedule B to the Operating Agreement, entitled "Licensed Rights," provides that, as of the date of the Operating Agreement until the end of the term of the Operating Agreement, Churchill Downs and Magna "shall, for all race meets of each of its race tracks . . . (i) exclusively <u>license</u> to [TrackNet] under the terms of the [Operating] Agreement such track's ADW Content Rights, Point to Point Content Rights and Rebate Content Rights, and (ii) grant to [TrackNet] the exclusive right to <u>sublicense</u> such track's respective ADW Content Rights, Point to Point Content Rights and Rebate Content Rights . . . ." Ex. 8, Schedule B ¶ A (emphasis

---

[5] The Operating Agreement provides that "ADW Content Rights shall mean solely for purposes of [advance deposit wagering] all wagering, audio, video, date and replay rights related to horse racing or dog racing whether distributed through internet, wireless, telephone, satellite, television, broadband, mobile or video streaming." Ex. 8 at 30. The Operating Agreement defines "Point to Point Content Rights" as "all wagering, audio, video, data and replay rights related to horse racing or dog racing for purposes of pari-mutuel wagering at a race track or other location which constitutes a simulcasting facility (i.e., a race track, off track betting facility or other fixed 'brick and mortar' facility open to the general public) for use at such receiving location." Ex. 8 at 36. The Operating Agreement defines "Rebate Content Rights" as "all wagering, audio, video, data, and replay rights related to horse racing or dog racing for purposes of Rebating." Ex. 8 at 37. "Rebating" is defined in the Operating Agreement as "the practice by an entity that conducts [advance deposit wagering] of providing volume based incentives (i) exceeding two percent (2%) of the total handle wagered through such entity, or (ii) to any [advance deposit wagering] customer in excess of four percent (4%) of the total handle wagered by such [advance deposit wagering] customer." <u>Id.</u>

added).  Schedule B also states that Churchill Downs and Magna "grant and license to

[TrackNet] the right . . . ., as the sole and exclusive <u>agent</u> for [Churchill Downs] and [Magna],"

to "<u>sublicense</u>" those same rights listed above.  Ex. 8, Schedule B ¶ B. 4, 5, 6, 7, 9 (emphasis

added).

     C.  <u>Interpretation of the Operating Agreement</u>

The Operating Agreement provides that Delaware state law governs its interpretation and

enforceability, as well as the rights of the parties thereto.  Ex. 8 ¶ 10.5.  Under Delaware law,

"[w]hen interpreting a contract, the role of the Court is to effectuate the parties' intent."

<u>Lorillard Tobacco Co. v. Am. Legacy Found.</u>, 903 A.D. 728, 739 (Del. 2006).  The Court must

determine "what a reasonable person in the position of the parties would have thought the

language of the contract means."  <u>Id.</u>  If a contract is clear and unambiguous, the plain meaning

of the terms will control.  <u>Id.</u> (citing <u>Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.</u>,

616 A.2d 1192, 1195-1196 (Del. 1992).  However, when a contract's terms are ambiguous, a

court may consider extrinsic evidence, including the conduct of the parties, to determine the

parties' intent.  <u>Georgetown Crossing LLC v. Ruhl</u>, No. 589-S, 2006 WL 4782273, at *6 (Del.

Ch. Dec. 5, 2006).  Furthermore, "[a] court must interpret contractual provisions in a way that

gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions

of the instrument when read as a whole."  <u>Council of Dorset Condo. Apartments v. Gordon</u>, 801

A.2d 1, 7 (Del. 2002).

It may appear that the Operating Agreement is internally inconsistent in defining the

relationship between TrackNet, on the one hand, and Churchill Downs and Magna, on the other.

The Operating Agreement clearly provides that TrackNet is agent for Churchill Downs and

Magna: at paragraph 1.3[b], the Operating Agreement provides that TrackNet, "as the sole and

exclusive agent" for Churchill Downs, the other parties to the Operating Agreement, and their

affiliates, "will, on behalf of" those parties and their affiliates, "sublicense" ADW Content

Rights, Point-to-Point Content Rights and Rebate Content Rights; and Schedule B ("Licensed

Rights") contains similar language at  paragraph B(5),(6), and (7).  At the same time, at

paragraph A of Schedule B, TrackNet is granted rights as a licensor to sublicense the "ADW

Content Rights, Point to Point Content Rights and Rebate Content Rights" for the tracks owned

by Churchill Downs and Magna.

However, these provisions of the Operating Agreement can be understood to give effect

to each.  TrackNet's authority to act as agent for Churchill Downs and Magna, and its right to act

as a licensee and sublicensor with respect to the rights owned by Churchill Downs and Magna,

need not be viewed as mutually exclusive.  That is, while Churchill Downs, under the Operating

Agreement, granted a license to TrackNet, Churchill Downs also authorized TrackNet, as agent,

to "sublicense" those rights on its behalf.  The Term "sublicense" is used in paragraph 1(b), and

in paragraph B of Schedule B, where it appears that "license" is meant; those provisions are

obviously intended to grant TrackNet the authority as agent to license the rights in question on

Churchill Downs's behalf.  This interpretation is consistent with Churchill Downs's reservation

of rights to "sublicense" directly to third parties.  Ex. 8, Schedule B ¶ B, 9.  Here, too, the

Operating Agreement uses the term "sublicense" where "license" would be appropriate; as owner

of the rights in question, Churchill Downs would be acting as licensor, not sublicensor.  In any

event, whether or not "sublicense" is understood as "license" in the clauses quoted above, it is

clear that the parties to the Operating Agreement intended to authorize TrackNet to act as their

agent in the distribution of wagering and simulcast rights.

This conclusion is reinforced by paragraph 5.3[i] of the Operating Agreement, which provides as follows:

> All simulcast import agreements for ADW Import Content, Point to Point Import Content and Rebate Import Content, and simulcast export agreements for ADW Export Content, Point to Point Export Content and Rebate Export Content entered into pursuant to this [Operating] Agreement shall not be executed by [TrackNet] on its own behalf, but rather shall be executed by [TrackNet] as agent for the applicable [race tracks and off track betting facilities controlled by Churchill Downs and Magna] . . . and/or [any advance deposit wagering service controlled by Churchill Downs].  All rights and obligations under the simulcast import agreements and simulcast export agreements entered into pursuant to this [Operating] Agreement shall be rights and obligations of the applicable [race tracks and off track betting facilities controlled by Churchill Downs and Magna] . . . and/or [any advance deposit wagering service controlled by Churchill Downs], and shall not be rights or obligations of [TrackNet].

Ex. 8 ¶ 5.3[i].  The Term Sheet and Amended Term Sheet clearly fall within the category of "simulcast export agreements for ADW Export Content, Point to Point Export Content and Rebate Export Content."[6]  The Term Sheet and Amended Term Sheet provide for Suffolk OTB and the other regional off-track betting corporations to receive and display simulcast signals of races conducted at the Churchill Tracks, for which Churchill Downs holds the rights.  Indeed, this is conceded by Suffolk OTB in the Joint Stipulation of Facts, which states that TrackNet and the regional off-track betting corporations "executed a term sheet whereby the OTBs were granted the right to accept commingled pari-mutuel wagers on, and display the signals of, races conducted at racetracks for which TrackNet served as agent."  Joint Stipulation of Facts ¶ 4, ECF No. 137.  Although the Amended Term Sheet contemplated that the parties would enter into a separate simulcast agreement, this never occurred; accordingly, the simulcast content received by

---

[6] ADW Export Content, Point to Point Export Content and Rebate Export Content are defined in the Operating Agreement as Churchill Downs, Magna, and their affiliates' ADW Content Rights, Point to Point Content Rights, and Rebate Content Rights "sold or distributed or sublicensed to" third parties.  Ex. 8 at 30, 36, 37.

Suffolk OTB is provided pursuant to the Amended Term Sheet.  Ex. 10 ¶ 7; Suffolk OTB's Brief

Regarding Churchill Downs Incorporation's Lack of Standing to Prosecute Its Objection to

Debtor's Petition ("Suffolk OTB Standing Brief") ¶ 13, ECF No. 126.  Therefore, the Amended

Term Sheet must be viewed as a "simulcast export agreement,"[7] which, according to paragraph

5.3[i] of the Operating Agreement, TrackNet was authorized to execute only as agent.

The conclusion that TrackNet was authorized under the Operating Agreement to act as

agent for Churchill Downs in licensing wagering and simulcast rights, and to sublicense those

rights, is also consistent with the terms of the Dissolution Agreement, which provides for the

termination of all agency relationships and licenses created by the Operating Agreement:

> Immediately and automatically upon the expiration of the
> Transition Period, (i) all agency relationships between [the parties
> to the Dissolution Agreement, including Churchill Downs] and
> [TrackNet] created in the Operating Agreement shall be terminated
> and [TrackNet] shall not be authorized to act on behalf of any of
> the [p]arties and (ii) all licenses granted by the [p]arties to
> [TrackNet] in the Operating Agreement shall be terminated and
> shall vest in the [p]arty contributing such licenses . . . .

Ex. 12 ¶ 1.

### D.  Churchill Downs's Status as a Party to the Amended Term Sheet

Given the conclusion that the Operating Agreement authorized TrackNet to act as agent

for Churchill Downs and as licensee of Churchill Downs's rights, the capacity in which

TrackNet entered into the Amended Term Sheet must be determined.  The evidence presented at

trial establishes that TrackNet executed the Amended Term Sheet as Churchill Downs's agent.

---

[7]  Suffolk OTB asserts (in connection with an argument concerning the effect of the Dissolution Agreement) that
the Amended Term Sheet "is not simply a simulcast import or export agreement" because it "sets forth the terms and
conditions upon which [the New York State regional off-track betting corporations] may accept commingled pari-
mutuel wagers on, and display the audio-visual signals of, races conducted at the TrackNet-affiliated racetracks."
Suffolk OTB Standing Brief ¶ 13, ECF No. 126.  Even if this is correct, the Amended Term Sheet still constitutes a
"simulcast export agreement" under paragraph 5.3[i] of the Operating Agreement because it provides for the
distribution of simulcast rights, in combination with other rights.

Patrick Troutman, a current vice president of Churchill Downs and the former executive vice president of TrackNet, testified that he signed the Term Sheet and the Amended Term Sheet on TrackNet's behalf solely as agent for the racetracks owned or controlled by Churchill Downs and Magna.  Troutman Aff. ¶¶ 2, 6-9, Oct. 20, 2011, ECF No. 136-1; Tr.[8] 10/25/11 at 90, 92-93, 94-95, ECF No. 148.  He further testified that TrackNet did not hold an ownership interest in the simulcast signals owned by Churchill Downs or Magna, and that he was unaware of any licenses granted to TrackNet by Churchill Downs or Magna.  Troutman Aff. ¶ 5, ECF No. 136-1; Tr. 10/25/11 at 97, ECF No. 148.

Furthermore, Suffolk OTB stipulated that TrackNet served as agent for Churchill Downs and Magna "in the negotiation and distribution of their respective simulcast signals to racetracks and off-track betting entities," and that TrackNet entered into the Term Sheet and Amended Term Sheet "as agent" for the racetracks listed in those agreements.  Joint Stipulation of Facts ¶¶ 2, 4, 6, ECF No. 137.  Additionally, throughout the term of the Amended Term Sheet, Suffolk OTB remitted payments to Churchill Downs Simulcast Network, Churchill Downs's product content provider, and not to TrackNet.  Joint Stipulation of Facts ¶¶ 7, 10, ECF No. 137; Tr. 10/25/11 at 113, ECF No. 148.

In light of the conclusion that TrackNet entered into the Amended Term Sheet as the agent of Churchill Downs, it is necessary to determine whether Churchill Downs is a party to the Amended Term Sheet.

Delaware courts apply the Restatement of Agency in analyzing the legal effect of an agency relationship.  Dassen v. Boland, C.A. No. S09C–06–042, 2011 WL 1225579, at *5 (Del. Super. Ct. Mar. 23, 2011); Pisano v. Del. Solid Waste Auth., C.A. No. 05C-03-132-FSS, 2006 WL 3457686, at *9 (Del. Super. Ct. Nov. 30, 2006).  If Churchill Downs was an undisclosed

---

[8] "Tr." refers to the transcript of the hearing held on the date indicated.

principal of TrackNet, as Suffolk OTB alleges, § 6.03 of the Restatement (Third) of Agency

applies, which provides, in relevant part:

> When an agent acting with actual authority makes a contract on behalf of an undisclosed principal,
> (1) unless excluded by the contract, the principal is a party to the contract;
> (2) the agent and the third party are parties to the contract; and
> (3) the principal, if a party to the contract, and the third party have the same rights, liabilities, and defenses against each other as if the principal made the contract personally . . . .

Restatement (Third) of Agency § 6.03. In connection with subdivision (1), "[a]n explicit

exclusion limits the third party's manifestation of assent to be bound. Such an explicit exclusion

provides a simple device through which a third party may exclude the interests of persons other

than those identified as parties to the contract." Restatement (Third) of Agency § 6.03 cmt. d.

For example:

> A enters into a stock-purchase agreement with T Corporation. The agreement contains a representation made by A that A acts solely for A's account and that no other person will have any interest in the securities that A will acquire from T Corporation. The agreement excludes P, A's undisclosed principal, from rights or obligations under the agreement.

Id.

The Amended Term Sheet contained no such exclusion of undisclosed principals from

the contract, and therefore, Churchill Downs, as the undisclosed principal of TrackNet, is a party

to the Amended Term Sheet as a matter of law.[9]

Suffolk OTB argues that it has no contractual relationship with Churchill Downs, because

Churchill Downs was not a member of TrackNet and therefore did not "step into the shoes" of

TrackNet, or receive any of its assets, upon TrackNet's dissolution, and because the Dissolution

---

[9] If Churchill Downs were a disclosed principal, the result would be the same. See Restatement (Third) of Agency § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract . . . .")

Agreement did not assign the Amended Term Sheet to Churchill Downs.  Suffolk OTB also

notes that TrackNet was in good standing with the state of Delaware as of the dates of the

bankruptcy filing and Churchill Downs's objection.

Given that Churchill Downs, as principal, was a party to the Amended Term Sheet from

its inception, Suffolk OTB's arguments concerning the rights acquired, or not acquired, by

Churchill Downs upon TrackNet's dissolution are irrelevant.  Churchill Downs is a party to the

Amended Term Sheet not as successor to TrackNet, but as a principal.  Churchill Downs's status

as a party to the Amended Term Sheet with Suffolk OTB is unaffected by the termination of its

agency relationship with TrackNet.  No assignment of the Amended Term Sheet from TrackNet

to Churchill Downs was required because Churchill Downs was already a party to that contract.

Even if TrackNet's rights, as agent, under the Amended Term Sheet devolved to its members

upon its dissolution, Churchill Downs, as principal, is still a party to the contract with Suffolk

OTB.

Similarly, it is irrelevant that TrackNet's Certificate of Cancellation was not filed with

the Delaware Secretary of State until September 12, 2011.  Churchill Downs, a principal, is a

party to the Amended Term Sheet, and would be even if TrackNet had not dissolved.

Suffolk OTB, relying on the Restatement (Second) of Contracts § 326, contends that the

Dissolution Agreement resulted in Churchill Downs becoming, at best, a partial assignee because

it cannot alone perform all of the obligations under the Amended Term Sheet, and therefore

would have standing only if all of the parties to the Amended Term Sheet joined in the objection.

The Restatement (Second) of Contracts § 326 provides, in pertinent part:

> If the obligor has not contracted to perform separately the assigned
> part of a right, no legal proceeding can be maintained by the
> assignor or assignee against the obligor over his objection, unless
> all the persons entitled to the promised performance are joined in

> the proceeding, or unless joinder is not feasible and it is equitable
> to proceed without joinder.

Restatement (Second) of Contracts § 326(2).

Suffolk OTB's reliance on the Restatement (Second) of Contracts is misplaced, and its argument that Churchill Downs is a partial assignee, lacking standing to enforce the Amended Term Sheet absent joinder of all the other parties, must be rejected. Churchill Downs was not partially assigned rights under the Amended Term Sheet upon TrackNet's dissolution; rather, it was a party to the Amended Term Sheet from its inception.

Suffolk OTB also argues that, even if TrackNet executed the Amended Term Sheet as an agent for Churchill Downs and other principals, Churchill Downs would not have standing to enforce the contract unless all of the principals joined in the action. In support of this position, Suffolk OTB cites Restatement (Second) of Agency § 305 and Brunswick Leasing Corp. v. Wis. Cent., Ltd., 136 F.3d 521 (7th Cir. 1998), for the proposition that no single principal may sue under the contract that was entered into by an agent on behalf of multiple principals. Restatement (Second) of Agency § 305 provides: "Unless otherwise agreed between the principal and the agent, the other party to a contract made by an agent for several undisclosed principals who have not jointly authorized him is not liable in an action at law upon the contract brought by one of them alone." Restatement (Second) of Agency § 305. Brunswick Leasing, relying on this section, held that the plaintiff in that case, "one of multiple undisclosed principals" to a contract, "may not sue to enforce a part of a contract entered into by its agent." Brunswick Leasing, 136 F.3d at 531.

This argument reflects a misunderstanding of applicable agency law. An agent may enter into a single contract on behalf of multiple principals, and each of those principals is a party to the contract with standing to enforce its rights thereunder. Restatement (Third) of Agency

§§ 3.16 ("Two or more persons may as coprincipals appoint an agent to act for them in the same transaction or matter"), 6.03 ("unless excluded by the contracts, the [undisclosed] principal is a party to the contract"), 6.05 cmt. a ("Multiple principals who appoint the same agent to act for them in the same matter or transaction are covered by § 3.16.").

The provision of the Restatement (Second) of Agency on which Suffolk OTB relies in support of this argument has no application in this case.  The Restatement (Second) of Agency was superseded by the Restatement (Third) of Agency, which was adopted in 2005 and published in 2006.  The Restatement (Third) of Agency did not adopt § 305 as it existed under the Restatement (Second) of Agency, rather, it incorporated that provision, along with §§ 148, 187, and 294, into new § 6.05(2), which provides, in pertinent part:

> Two or more principals may authorize the same agent to make separate contracts for them.  If the agent makes a single contract with a third party on the principals' behalves that combines the principals' separate orders or interests and calls for a single performance by the third party,
>> (a) if the agent purports to make the combined contract on behalf of disclosed principals, the agent is subject to liability to the third party for breach of the agent's warranty of authority as stated in § 6.10, unless the separate principals are bound by the combined contract;
>> (b) if the principals are unidentified or undisclosed, the third party and the agent are the only parties to the combined contract; and
>> (c) unless the agent acted with actual or apparent authority to bind each of the principals to the combined contract, (i) subject to (1), none of the separate principals is subject to liability on the combined contract; and (ii) the third party is not subject to liability on the combined contract to any of the separate principals.

Restatement (Third) of Agency § 6.05(2).  This section applies only when "[t]wo or more principals . . . authorize the same agent to make separate contracts for them," and the agent

nevertheless "makes a <u>single</u> contract . . . on the principals' behalves." <u>Id.</u> (emphasis added).[10]

"Multiple principals who appoint the same agent to act for them in the same matter or transaction

are covered by § 3.16," Restatement (Third) of Agency § 6.05 cmt. a, which permits an agent to

enter into a single contract on behalf of multiple principals, Restatement (Third) of Agency

§ 3.16.  Nothing in the record indicates that TrackNet was directed to enter into separate

contracts for Churchill Downs and Magna.  To the contrary, the fact that Churchill Downs and

Magna designated TrackNet as their mutual agent in a single contract, the Operating Agreement,

supports the conclusion that TrackNet was authorized to enter into a single contract on their

behalf.  Therefore, in the absence of evidence to establish that TrackNet was not authorized to

enter into a single contract on behalf of Churchill Downs and Magna, Restatement (Third) of

Agency § 6.05(2) is inapplicable, and §§ 3.16 and 6.03 apply, which provide that an agent may

enter into a contract on behalf of multiple principals, and undisclosed principals are parties to a

contract unless the contract specifically excludes them.

    E.  <u>Suffolk OTB's Other Arguments</u>

    In a further effort to deny Churchill Downs standing to be heard on its objection to this

chapter 9 case, Suffolk OTB questions the validity and enforceability of the Amended Term

Sheet.  Suffolk OTB argues that, according to the Dissolution Agreement, the agency

relationship between Churchill Downs and TrackNet terminated on June 14, 2010, and that the

Amended Term Sheet did not become effective until it was approved by the Racing and

Wagering Board on June 18, 2010.  Therefore, Suffolk OTB argues that TrackNet was not

---

[10]   The superseded § 305 of Restatement (Second) of Agency, relied upon by Suffolk OTB, is also limited to a situation where an agent was not authorized to enter into a single contract for multiple principals: "[u]nless otherwise agreed between the principal and the agent, the other party to a contract made by an agent for several undisclosed principals <u>who have not jointly authorized him</u> is not liable in an action at law upon the contract brought by one of them alone."  Restatement (Second) of Agency § 305 (emphasis added).

authorized to act as Churchill Downs's agent at the time the Amended Term Sheet became an effective contract.

Assuming, without concluding, that Suffolk OTB has standing to challenge the enforceability of the Amended Term Sheet on this basis, this argument must be rejected.  The Dissolution Agreement provides that the agency relationship with TrackNet will terminate "immediately and automatically upon the expiration of the Transition Period," which is "thirty (30) calendar days (or such shorter or longer period as the Parties may agree in writing) commencing upon the execution of [the] Dissolution Agreement."  Ex. 12 ¶ 1.  It is unclear whether the Transition Period was extended; however, even if the agency relationship terminated prior to the effective date of the Amended Term Sheet, Churchill Downs ratified TrackNet's execution of the contract on its behalf.

Restatement (Third) of Agency § 4.01 provides, in pertinent part:

> (1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.
> (2) A person ratifies an act by
> > (a) manifesting assent that the act shall affect the person's legal relations, or
> > (b) conduct that justifies a reasonable assumption that the person so consents.

Restatement (Third) of Agency § 4.01(1), (2).

Churchill Downs ratified TrackNet's execution of the Amended Term Sheet by performing under the contract and providing the simulcast signals for its tracks.  Churchill Downs's ratification "retroactively creates the effects of actual authority," Restatement (Third) of Agency § 4.02(1), and as such, Churchill Downs is a party to the Amended Term Sheet.

Suffolk OTB also argues that the failure to disclose that TrackNet dissolved "violated the general contractual obligation to deal in good faith and may constitute fraud in the inducement,"

rendering the Amended Term Sheet void or voidable.  Suffolk OTB's Standing Brief ¶ 17, ECF No. 126.

Under Delaware law, a party alleging breach of the obligation to deal in good faith must "allege a specific implied contractual obligation and allege how the violation of that obligation denied the [party] the fruits of the contract."  Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009).  A party alleging fraud in the inducement must allege with particularity "(1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance."  Kuhn Constr. Co. v. Diamond State Port Corp., Civ. No. 10-637-SLR, 2011 WL 1576691, at *9 (D. Del. Apr. 26, 2011); Duffield Assocs., Inc. v. Meridian Architects & Eng'rs, LLC, C.A. No. S10C-03-004 FRS, 2010 WL 2802409, at *4 (Del. Super. Ct. July 12, 2010).  Suffolk OTB received the simulcast signals and the other benefits to which it was entitled under the Amended Term Sheet; accordingly, there is no basis to conclude that Suffolk OTB did not receive the fruits of the contract or that it incurred damages as a result of the failure to disclose TrackNet's dissolution.  As such, these arguments must be rejected.

For these reasons, Churchill Downs is a party to the Amended Term Sheet.  Suffolk OTB concedes that the Amended Term Sheet is an executory contract, notwithstanding the payment of $100,000 "as an advance against any amounts that might be payable to Churchill [Downs] for future simulcast content and related wagering activity."  Gazes Decl. ¶ 9, ECF No. 141.  The Amended Term Sheet does not simply provide for payment of a sum certain each month. Payments required to be made depend on wagers placed and on the amount of winning bets;

therefore, even if, as Suffolk OTB asserts, the advance is twice the amount which has historically been required to be paid for the period, it is not possible to conclude that no additional amounts may be owned to Churchill Downs under the Amended Term Sheet.  Additionally, as Churchill Downs notes, the Amended Term Sheet, which incorporates, modifies, and extends the Term Sheet, imposes ongoing non-monetary obligations on Suffolk OTB, and the failure to perform those obligations could give rise to a claim for breach of contract, e.g., Ex. 9 at 1 ("[The New York State regional off-track betting corporations] commit[] to display and accept wagers on each TrackNet simulcast signal covered by this Agreement, and in doing so to make good faith efforts to market such simulcast content to an extent no less favorable than any non-TrackNet track of comparable quality.").  See Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973) (An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.").  See also ReGen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.), 547 F.3d 484, 488 n.1 (2d Cir. 2008) ("Although § 365 does not define the term "executory contracts," courts have long employed the definition articulated by Professor Countryman . . . .").

If an order for relief is entered, the Amended Term Sheet, as an executory contract, is subject to Suffolk OTB's assumption or rejection pursuant to §§ 365 and 901, and Churchill Downs, as a party to the Amended Term Sheet, would have standing to be heard in connection with any motion to assume or reject that contract.  If Churchill Downs has standing to be heard on the issue of assumption or rejection of the Amended Term Sheet in this bankruptcy case, it

has standing to be heard on the threshold issue of Suffolk OTB's entitlement to commence this bankruptcy case.

The fact that the Amended Term Sheet will expire on December 31, 2011 has no effect on Churchill Downs's standing to object to the petition.  As of the date of filing, and as of the date of this decision, Churchill Downs is a party to an executory contract with the Debtor, and has standing to object to and the entry of an order for relief.  Moreover, Suffolk OTB clearly contemplates an ongoing contractual relationship with Churchill Downs throughout the duration of this case.  Tr. 6/15/11 at 9, ECF No. 98.[11]

II.    <u>Suffolk OTB is not eligible for chapter 9 relief.</u>

Section 109(c) governs eligibility under chapter 9, and provides:

> An entity may be a debtor under chapter 9 of this title if and only if such entity--
>> (1) is a municipality;
>> (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>> (3) is insolvent;
>> (4) desires to effect a plan to adjust such debts; and
>> (5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>>> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>>> (C) is unable to negotiate with creditors because such negotiation is impracticable; or

---

[11] Suffolk OTB's counsel stated: "we consider [Churchill Downs] to be a critical vendor, it is our intention to honor that executory contract, assume the executory contract, pay them in full and continue a fruitful relationship going forward."

>(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c).

The debtor bears the burden to establish that the requirements of § 109(c) are satisfied. Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009); In re Boise County, No. 11-00481-TLM, 2011 WL 3875639, at *6 (Bankr. D. Idaho Sept. 2, 2011); In re N.Y.C. Off-Track Betting Corp., 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010); In re Valley Health Sys., 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008); In re Slocum Lake Drainage Dist. of Lake County, 336 B.R. 387, 390 (Bankr. N.D. Ill. 2006); SunTrust Bank v. Alleghany-Highlands Econ. Dev. Auth. (In re Alleghany-Highlands Econ. Dev. Auth.), 270 B.R. 647, 649 (Bankr. W.D. Va. 2001); In re County of Orange, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995). A court should "construe broadly § 109(c)'s eligibility requirements 'to provide access to relief in furtherance of the [Bankruptcy] Code's underlying policies.'" Vallejo, 408 B.R. at 289 (quoting Valley Health Sys., 383 B.R. at 163)). At the same time, however, chapter 9 petitions should be viewed "with a jaded eye." N.Y.C. Off-Track Betting, 427 B.R. at 264. "Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtail the power of bankruptcy courts to compel municipalities to act once a petition is approved." Id.

By the same token, "[t]he bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress'[s] bankruptcy power and the limitations on federal power under the Tenth Amendment." In re Sullivan Reg'l County Refuse Disposal Dist., 165 B.R. 60, 82 (Bankr. D.N.H. 1994). Courts evaluating chapter 9 filings must

balance these constitutional concerns with congressional intent to provide access to chapter 9 relief in accordance with the Bankruptcy Code's policies.  N.Y.C. Off-Track Betting, 427 B.R. at 265 (citing cases).

Suffolk OTB's compliance with § 109(c)(1), (3), (4), and (5) is not challenged.  With respect to § 109(c)(2), Suffolk OTB concedes that it was not specifically authorized by state law to file its bankruptcy petition.  Rather, Suffolk OTB argues that the requirement of § 109(c)(2) was satisfied by compliance with the second clause of that provision, because the instant bankruptcy filing was specifically authorized by the Suffolk County Legislature, which, according to Suffolk OTB, is "a governmental officer or organization empowered by State law to authorize [Suffolk OTB] to be a debtor under [chapter 9]."  See 11 U.S.C. § 109(c)(2).

Churchill Downs argues that the County Resolution exceeds the scope of the Suffolk County Legislature's authority, and therefore, Suffolk OTB's bankruptcy filing has not been authorized as required by § 109(c)(2).  Resolution of this issue hinges upon whether New York State law empowers the Suffolk County Legislature to authorize Suffolk OTB's bankruptcy filing.

A.    Local Finance Law § 85.80

Suffolk OTB argues that New York's Local Finance Law § 85.80 grants Suffolk County Legislature the power to authorize Suffolk OTB's bankruptcy filing.  That statute provides:

> A municipality or its emergency financial control board in addition to, or in lieu of, filing a petition under this title, or the city of New York or the New York state financial control board, may file any petition with any United States district court or court of bankruptcy under any provision of the laws of the United States, now or hereafter in effect, for the composition or adjustment of municipal indebtedness.

N.Y. Local Fin. Law § 85.80.

The Local Finance Law defines "municipality" as "a county, city, town or village." N.Y. Local Fin. Law § 2.00(1). Because Suffolk County is a municipality under the Local Finance Law and is authorized to file a petition on its own behalf, Suffolk OTB argues that Suffolk County is also empowered to authorize Suffolk OTB's bankruptcy petition. Suffolk OTB also argues that the legislature intended Local Finance Law § 85.80 to apply to public benefit corporations, and that "municipality" as used in Local Finance Law § 2.00(1) should be understood to include a public benefit corporation. Tr. 6/15/11 at 30, ECF No. 98.

Suffolk OTB has provided no authority to support its expansive reading of Local Finance Law § 85.80. The New York Court of Appeals recently explained:

> "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." Additionally, "[w]here a statute describes the particular situations in which it is to apply and no qualifying exception is added, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded."

Raynor v. Landmark Chrysler, ---N.E.2d ---, 2011 N.Y. slip op. 08183, 2011 WL 5526037 (N.Y. Nov. 15, 2011) (alteration in original) (citations omitted).

Local Finance Law § 85.80 is clear that Suffolk County is authorized to file a chapter 9 petition on its own behalf, but nothing in the language of that statute permits Suffolk County to authorize the bankruptcy filing of a separate entity, such Suffolk OTB. See Lemma v. Off Track Betting Corp., 707 N.Y.S.2d 276, 278 (N.Y. App. Div. 2000) (A regional off-track betting corporation "is a separate and distinct legal entity created pursuant to the Racing, Pari-Mutual Wagering and Breeding Law."). See also N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 503 (listing powers of the off-track betting corporations, including the power to sue and be sued, to own property, and to enter into contracts). Furthermore, while Suffolk OTB may be a municipality as

defined by the Bankruptcy Code, see N.Y.C. Off-Track Betting, 427 B.R. at 265-266, it is not a municipality under the Local Finance Law.  Local Finance Law § 2.00(1) defines "municipality," for the purposes of that statute, as "a county, city, town or village."  N.Y. Local Fin. Law § 2.00(1).  Had the State Legislature intended the Local Finance Law to permit a municipality, as defined thereunder, to authorize a bankruptcy petition for a separate legal entity, it would have drafted the statute accordingly.  By the same token, had the State Legislature intended Local Finance Law § 85.80 to extend to public benefit corporations, the definition of "municipality" would have included them.  In sum, Local Finance Law § 85.80 provides no basis upon which to conclude that Suffolk OTB's bankruptcy filing was authorized under § 109(c)(2).

> B.    Racing and Wagering Law, Municipal Home Rule Law and Suffolk County Charter

Suffolk OTB argues that Article V of the Racing and Wagering Law grants control of Suffolk OTB to Suffolk County, and that therefore the Suffolk County Legislature was empowered to authorize Suffolk OTB to file a petition under chapter 9 of the Bankruptcy Code.

Suffolk OTB is a public benefit corporation created by Racing and Wagering Law § 502. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(1).  "A 'public benefit corporation' is a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof." N.Y. Gen. Constr. Law § 66(4).  The New York regional off-track betting corporations created by the Racing and Wagering Law operate pari-mutuel betting systems, which are gambling systems "in which bets placed on a race are pooled and then paid (less a management fee and taxes) to those holding winning tickets.'' N.Y.C. Off-Track Betting, 427 B.R. at 261 (quoting Black's Law Dictionary (8th ed. 2004)).

Counties are required to pass enabling legislation in order to participate in the off-track betting system. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(3). Upon passing enabling legislation and filing a certificate with the Secretary of State and with the State Racing and Wagering Board, participating counties are empowered to appoint the board of directors for their respective off-track betting corporations. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(1), (3). "The powers of the corporation [are] vested in and exercised by the board of directors . . . ." N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(8). Upon termination of an off-track betting corporation, "all of its rights, property, assets, and funds shall . . . vest in and be possessed by the participating counties." N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(5)(a).

Suffolk County enacted enabling legislation to participate in the regional off-track betting system. Suffolk County Code §§ 123-1, 123-2. Pursuant to Racing and Wagering Law § 502(1), the Suffolk County Legislature appointed the three members of Suffolk OTB's board of directors. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(1). However, Suffolk County does not maintain unfettered control over Suffolk OTB. Rather, the New York State Racing and Wagering Board (the "Racing and Wagering Board") has "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein." N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 101. As such, the Racing and Wagering Board must approve each corporation's plan of operation (including contracts for audio-visual broadcasts of races) and betting programs, among other things. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 521; N.Y. Comp. Codes R. & Regs. tit. 9, §§ 5203.2-5203.14.

Suffolk OTB concedes that the Racing and Wagering Law does not contain a provision empowering Suffolk County to authorize Suffolk OTB's chapter 9 filing. This omission, in the

context of the comprehensive regulatory scheme created by the Racing and Wagering Law, cannot be viewed as an oversight. As explained by the New York Court of Appeals, when interpreting a statute, it must be recognized that "what is omitted . . . was intended to be omitted." Raynor, 2011 WL 5526037 (quoting Alonzo M. v. N.Y.C. Dep't of Prob., 72 N.Y.2d 662, 665 (N.Y. 1988.)) For these reasons, it is improper to read into the statute a grant of authority to the Suffolk County Legislature to authorize Suffolk OTB's bankruptcy filing. See Town of Hoosick v. E. Rensselaer County Solid Waste Mgmt. Auth., 182 A.D.2d 37, 39-40 (N.Y. App. Div. 1992) (the absence of withdrawal language from a statute governing a public benefit corporation dealing with solid waste management was an intentional omission by the State Legislature, and therefore, town was not permitted to enact legislation revoking enabling legislation).

Notwithstanding the lack of express statutory authorization, Suffolk OTB argues that the Suffolk County Legislature's power to authorize Suffolk OTB's bankruptcy filing is implied from the provisions of the New York State Constitution, Municipal Home Rule Law, Local Finance Law, and the Racing and Wagering Law. Suffolk OTB points out that the Racing and Wagering Law vests control of Suffolk OTB with Suffolk County insofar as (1) the Suffolk County Legislature was required to enact enabling legislation in order for Suffolk OTB to exist; (2) the Suffolk County Legislature appoints the members of Suffolk OTB's board of directors; (3) Suffolk OTB's net profits are remitted to Suffolk County; and (4) upon Suffolk OTB's termination, all of its assets vest with Suffolk County. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 502(1), (3), (5)(a), (8). Suffolk OTB contends that, in essence, it is a "creature of Suffolk County," Suffolk OTB's Post-Hearing Reply Brief ¶ 2, ECF No. 113, and that, because Suffolk County created Suffolk OTB, it can also dissolve it or put it in bankruptcy, Tr. 6/15/11 at 14,

ECF No. 98.  Additionally, Suffolk OTB also argues that county legislatures may legislate regarding matters of local concern, and that Suffolk OTB's existence, operation and bankruptcy filing is a matter of local concern to Suffolk County.

It is well settled that local governments "have only the lawmaking powers the Legislature confers on them," <u>DJL Rest. Corp. v. City of N.Y.</u>, 749 N.E.2d 186, 189 (N.Y. 2001) (<u>citing</u> <u>Kamhi v. Town of Yorktown</u>, 547 N.E.2d 346, 347 (N.Y. 1989)), or "expressly granted to them by the State Constitution," <u>Coconato v. Town of Esopus</u>, 547 N.Y.S.2d 953, 955 (N.Y. App. Div. 1989).  Pursuant to the New York State Constitution and state laws, "[l]ocal governments have been delegated broad powers to enact local legislation consistent with state laws."  <u>Willow Woods Manufactured Homeowner's Assn., Inc. v. R & R Mobile Home Park, Inc.</u>, 917 N.Y.S.2d 656, 659 (N.Y. App. Div. 2011) (<u>citing</u> N.Y. Const. art. IX, § 2; N.Y. Mun. Home Rule Law § 10).

Article IX § 2 of the New York State Constitution provides, in pertinent part:

> In addition to powers granted in the statute of local governments or any other law, (i) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government . . . .

N.Y. Const. art. IX, § 2(c).

Municipal Home Rule Law § 10 provides, in pertinent part:

> In addition to powers granted in the constitution, the statute of local governments or in any other law, (i) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of the constitution or not inconsistent with any general law relating to its property, affairs or government . . . .

N.Y. Mun. Home Rule Law § 10(1)(i).[12]

These sections prohibit local governments from enacting laws that are pre-empted by state laws. As explained by the New York Court of Appeals,

> Broadly speaking, State preemption occurs in one of two ways-- first, when a local government adopts a law that directly conflicts with a State statute and second, when a local government legislates in a field for which the State Legislature has assumed full regulatory responsibility. The State Legislature may expressly articulate its intent to occupy a field, but it need not. It may also do so by implication.
>
> An implied intent to preempt may be found in a "declaration of State policy by the State Legislature . . . or from the fact that the Legislature has enacted a comprehensive and detailed regulatory scheme in a particular area." In that event, a local government is precluded from legislating on the same subject matter unless it has received 'clear and explicit' authority to the contrary."

DJL Rest., 749 N.E.2d at 190 (omission in original) (citations and footnote omitted). See also Nassau County Town of N. Hempstead v. County of Nassau, 929 N.Y.S.2d 833, 837-838 (N.Y. Sup. Ct. 2011).

The State Legislature enacted the Racing and Wagering Law and Title 9, Subtitle T of the Official Compilation of Codes, Rules & Regulations for the State of New York, which constitute a "comprehensive and detailed regulatory scheme" in the area of off-track betting, and as such, any local law on that subject is preempted. See DJL Rest., 749 N.E.2d at 190. Accordingly, the

---

[12] Consistent with the State Constitution, article IX, §2, and Municipal Home Rule Law § 10, the Suffolk County Charter permits the Suffolk County Legislature to exercise the functions assigned to it by state law and the powers of local legislation and appropriation, and to adopt an administrative code. Suffolk County Charter §§ C2-1, C2-2.

Suffolk County Legislature exceeded its authority by adopting the County Resolution authorizing Suffolk OTB's bankruptcy filing. [13]  This conclusion is not affected by the fact that Suffolk County enacted the enabling legislation that constituted its election to participate in the off-track betting system, appoints Suffolk OTB's board of directors, receives Suffolk OTB's net profits, and would receive Suffolk OTB's assets upon termination.  As conceded by Suffolk OTB, the Racing and Wagering board is the governing "regulatory body" for all regional off-track betting corporations, including Suffolk OTB.  Tr. 6/15/11 at 14, ECF No. 98.  Suffolk County's authority to control Suffolk OTB is ultimately subject to the Racing and Wagering Board, which has "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein."  N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 101.  See Capital Dist. Reg'l Off-Track Betting Corp. v. N.Y. State Racing and Wagering Bd., 429 N.E.2d 733, 734 (N.Y. 1981) ("The legislative scheme demonstrates an intent to place ultimate supervisory and regulatory power in the [Racing and Wagering Board].").

Moreover, although Suffolk OTB asserts that "the nature of gambling . . . is a very, very local concern," it also conceded that the horse racing industry is "an important industry to New York State," and is "an important state concern."  Tr. 6/15/11 at 13, 20, ECF No. 98.  Indeed, Racing and Wagering Law § 518 specifically states that an objective of that statute is "to derive from such betting, as authorized by [that] article, a reasonable revenue for the support of

---

[13]   At one point, Suffolk OTB sought to distinguish between a county resolution and a county law, apparently suggesting that the County Resolution is a permissible exercise of power, even if a local law authorizing Suffolk OTB's bankruptcy filing would exceed Suffolk County's authority.  Suffolk OTB's Post-Hearing Reply Brief ¶ 13, ECF No. 113.  This argument must be rejected.  A local resolution and a local law are "both are legislative acts." Reese v. Lombard, 47 A.D.2d 327, 330 (N.Y. App. Div. 1975).  Suffolk OTB has not provided any authority to support a conclusion that Suffolk County may accomplish by resolution something that it is unauthorized to accomplish by local law, and has conceded that a resolution "is basically the equivalent of [a] local law."  Tr. 7/13/11 at 28, ECF No. 115.

government, and to prevent and curb unlawful bookmaking and illegal wagering on horse races."

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 518.  That section further explains:

> It is also the intention of [Article V-a] to ensure that off-track betting is conducted in a manner compatible with the well-being of the horse racing and breeding industries in this state, which industries are and should continue to be major sources of revenue to state and local government and sources of employment for thousands of state residents.

Id.  In light of those objectives, Racing and Wagering Law § 518 also specifically provides "that off-track pari-mutuel betting on horse races, conducted under the administration of the state racing and wagering board in the manner and subject to the conditions provided for in this article, shall be lawful, notwithstanding the provisions of any law, general, special or local."  Id. (emphasis added).

This section, together with the comprehensive regulatory scheme enacted by the State Legislature, expresses the legislature's intent to assume full regulatory responsibility for the off-track betting system.  To conclude otherwise would ignore the unambiguous provisions of Racing and Wagering Law § 518.  Accordingly, the County Resolution constitutes an impermissible attempt to legislate in an area preempted by State law.

Consistent with the conclusion that the operations of regional off-track betting corporations are not purely local in nature, but implicate state concerns, is the fact that the Racing and Wagering Law prescribes distributions that must be made to state and local government, and to New York breeders and racetracks.  These mandatory payments must be made before any operating expenses are paid by Suffolk OTB.  Casale Decl. ¶¶ 11-12, ECF No. 19.  Although Suffolk OTB cites these obligations as a factor contributing to its financial difficulties, these statutory payment requirements make it clear that the State has a direct financial interest in Suffolk OTB's operations.

Additionally, and perhaps most importantly, the County Resolution subjects a public benefit corporation created by the State to the provisions of title 11, U.S.C., thereby usurping the State's power in this regard, which is clearly beyond the scope of the Suffolk County Legislature's authority.  "The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress'[s] bankruptcy power and the limitations on federal power under the Tenth Amendment."  Sullivan County Reg'l Refuse Disposal Dist., 165 B.R. at 82.  Although § 109(c) should be construed broadly to give effect to Congress's intent "to expand 'the applicability of chapter IX as much as possible,'" N.Y.C. Off-Track Betting, 427 B.R. at 265 (quoting H.R. Rep. No. 94-686, at 18 (1975), reprinted in 1976 U.S.C.C.A.N. 539, 557), the Court may not accomplish this by turning a blind eye to New York law governing the scope of a county's authority.

This case is distinguishable from N.Y.C. Off-Track Betting, in which an off-track betting corporation's authority to seek chapter 9 relief was unsuccessfully challenged.  In that case, prior to the bankruptcy filing, the State legislature enacted legislation transferring control of the debtor from New York City to the state, and the governor issued an executive order authorizing the debtor to file a chapter 9 petition.  Id. at 263, 267.  After analyzing New York law, the court held that the executive order satisfied § 109(c)(2) because "[t]he Governor's executive power is broad . . . [and] enables [him] to act in certain circumstances, without a 'specific and detailed legislative expression authorizing a particular executive act.'"  Id. at 269 (quoting Bourquin v. Cuomo, 652 N.E.2d 171, 173 (N.Y. 1995)).  The court noted that "the Governor only lacks the power to act when he oversteps his constitutional role."  Id.

The Suffolk County Legislature does not possess the same broad scope of authority as the governor.  To the contrary, a county's powers are limited to those expressly granted to it by the

State Constitution or the State Legislature. <u>DJL Rest.</u>, 749 N.E.2d at 189; <u>Coconato</u>, 547 N.Y.S.2d at 955. The County Resolution exceeded Suffolk County's authority and is therefore unconstitutional and void.[14] <u>See</u> <u>Kamhi</u>, 547 N.E.2d at 347 ("Without legislative grant, an attempt to exercise such authority is ultra vires and void."); <u>Coconato</u>, 547 N.Y.S.2d at 955 ("If a local government acts beyond the scope of authority granted to it, its act will be considered unconstitutional."). Accordingly, Suffolk OTB has not complied with § 109(c)(2), and is therefore ineligible to be a debtor under chapter 9.

III.    Equity

      Suffolk OTB argues that, even if it the requirements of § 109(c)(2) were not met, it is within the Court's discretion to nonetheless enter the order for relief. Suffolk OTB points to the language of § 921(c), which states that "[a]fter any objection to the petition, the court, after notice and a hearing, <u>may</u> dismiss the petition if the . . . petition does not meet the requirements of this title." 11 U.S.C. § 921(c) (emphasis added). Suffolk OTB urges that equity weighs against dismissing this case, because it has proposed a chapter 9 plan pursuant to which all creditors will be paid in full, and because, if the case is dismissed, Suffolk OTB may be required to cease operations. Tr. 6/15/11 at 11, ECF No. 98.

      "Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under § 109(c)." <u>Vallejo</u>, 408 B.R. at 289. <u>See also</u> <u>Boise County</u>, 2011 WL 3875639, at *6;

---

[14] Suffolk OTB argued at the June 15, 2011 hearing that the County Executive, who cosigned the County Resolution, was empowered to issue an executive order authorizing Suffolk OTB's bankruptcy filing. Tr. 6/15/11 at 29, ECF No. 98. Suffolk OTB's attorney stated at the hearing that Suffolk OTB would brief that argument, but no briefing has been submitted. Therefore, this argument is deemed abandoned. Furthermore, a search has uncovered no authority to support an argument that a county executive possesses greater authority than the county legislature in this regard.

N.Y.C. Off-Track Betting, 427 B.R. at 264; Valley Health Sys., 383 B.R. at 160; County of Orange, 183 B.R. at 599.

Whether or not, under some circumstances, a court may have discretion to enter an order for relief in a chapter 9 case notwithstanding failure to meet all of the requirements of § 109(c), it would be inappropriate to do so in this case. The fundamental importance, in our federal system, of proper deference to state sovereignty, outweighs Suffolk OTB's arguments concerning the benefits which may flow to creditors and others from this chapter 9 case. The dismissal of this case does not preclude Suffolk OTB from addressing its problems in other ways, either by restructuring its debt outside chapter 9 or by filing another chapter 9 bankruptcy petition after receiving proper authorization.

<u>Conclusion</u>

For the foregoing reasons, Suffolk OTB's petition is dismissed pursuant to § 921(c). A separate order will issue.



**Dated: Brooklyn, New York**
**December 2, 2011**

**Carla E. Craig**
**United States Bankruptcy Judge**